UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JEFFREY A. DOBSON and
SHANNON D. DOBSON,

                Plaintiffs,

    v.

LIVINGSTON COUNTY SHERIFF
THOMAS J. DOUGHTERY,
COUNTY OF LIVINGSTON,
BRANDAN J. FLICKNER, and
JAMES MERRICK,

                Defendants.

_____

1:17-CV-1014 JLS (MJR)

REPORT AND
RECOMMENDATION

## INTRODUCTION

    This case has been referred to the undersigned by the District Court, pursuant to Section 636(b)(1) of Title 28 of the United States Code, for all pretrial matters and for hearing and reporting on dispositive motions.[1]    (Dkt. No. 3)    Before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.    (Dkt. No. 43)    For the following reasons, it is recommended that defendants' motion for summary judgment be granted.

## PROCEDURAL BACKGROUND

    This lawsuit arises from plaintiff Jeffrey A. Dobson's arrest on September 21, 2016 off Interstate Route 390 in the Town of Avon, New York for driving while under the

_____

[1] This case was first referred to the undersigned by the Honorable Lawrence J. Vilardo on October 24, 2017.    (Dkt. No. 3)  On January 5, 2020, this case was reassigned to the Honorable John L. Sinatra, Jr. (Dkt. No. 40)

influence of drugs.    The complaint, filed on behalf of plaintiffs Jeffrey Dobson and Shannon Dobson, asserts causes of action against defendants Brandan J. Flickner and James Merrick for false arrest, false imprisonment, malicious prosecution, excessive force, abuse of process, assault, battery, negligent infliction of emotional distress, and loss of consortium, in violation of Section 1983 of Title 42 of the United States Code, the Fourth and Fourteenth Amendments of the United States Constitution, and New York state law. (Dkt. No. 10)  On January 15, 2020, defendants Flickner and Merrick filed the instant motion for summary judgment as to all claims against them.   (Dkt. No. 43) Plaintiffs filed a response in opposition to the motion on March 9, 2020 (Dkt. Nos. 49-54, 56), and defendants filed a reply on March 23, 2020 (Dkt. Nos. 59-60).    In the memorandum of law filed in opposition to defendants' motion for summary judgment, plaintiffs' counsel asserted that "upon careful consideration of the known facts and law relating to this action", plaintiffs were withdrawing their claims for abuse of process, excessive force, assault, and battery. (Dkt. No. 54, pg.14)  In addition, plaintiffs' Rule 56 Opposing Statement to the Defendants' Statement of Material Facts indicates that plaintiffs are also withdrawing their claims for false arrest in violation of New York state law and negligent infliction of emotional distress.   (Dkt. No. 53; ¶11)   During oral argument, the parties agreed that plaintiffs were withdrawing all claims against defendants Flickner and Merrick with the exception of the federal and state false arrest claim, the federal and state false imprisonment claim, and the federal malicious prosecution claim.   Thus, there appears to be a discrepancy between plaintiffs' papers and the parties' representation during oral argument as to whether plaintiffs are still pursuing their state law false arrest claim or their state law malicious prosecution claim.

However, this discrepancy is irrelevant because, for the reasons explained herein, the Court finds that summary judgment should be granted in favor of both defendants Flickner and Merrick as to plaintiffs' false arrest, false imprisonment, and malicious prosecution claims pursuant to both federal and state law.[2]

The Court heard oral argument on June 3, 2020.   At the conclusion of the argument, the Court requested supplemental briefing regarding defendants' assertion that certain statements in plaintiff Jeffrey Dobson's ("Dobson") affidavit in opposition to defendants' summary judgment motion contradicted Dobson's prior deposition testimony. Defendants submitted a supplemental brief on June 10, 2020 (Dkt. No. 65) and plaintiffs submitted a response on June 17, 2020 (Dkt. No. 67).

## FACTS[3]

### *The 911 Call*

On September 21, 2016, Melissa Mumm, a dispatcher at the Livingston County Sheriff's Department, received a 911 call from a woman who reported that she was driving

---

[2] Plaintiffs' complaint also alleges constitutional violations against Sheriff Thomas J. Doughtery (the "Sheriff") and the County of Livingston (the "County") pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1977).  On April 18, 2019, the parties entered into a "Stipulation and Order Concerning Bifurcation and Discovery", which was approved and so-ordered by this Court.  (Dkt. No. 34) Specifically, plaintiffs agreed that their claims against defendants Flickner and Merrick would be bifurcated, for purposes of discovery and dispositive motions, from their *Monell* claims against the County and the Sheriff.  (*Id.*) The parties further recognized that if the claims against Flickner and Merrick were dismissed by dispositive motions, the *Monell* claims against the County and Sheriff would also be dismissed.  (*Id.*) Therefore, the parties agreed to stay all discovery relating to the *Monell* claims against the Sheriff and the County pending the outcome of any summary judgment motion filed by Flickner and Merrick.  (*Id.*)  Thus, the instant summary judgment motion was filed only on behalf of defendants Flickner and Merrick, and the instant Report and Recommendation address only the claims against these two defendants. Pursuant to the parties' Stipulation and Order Concerning Bifurcation and Discovery, and because "a plaintiff cannot allege a *Monell* claim where he has not alleged a valid underlying constitutional deprivation", *Lacey v. Yates Cnty.*, 30 F. Supp. 3d 213, 228 (WDNY 2014), should the District Court adopt the recommendation herein to grant summary judgment in favor of defendants Flickner and Merrick and dismiss all claims against them, the *Monell* claims against the Sheriff and the County should also be dismissed in their entirety, and the case should be closed.
[3] The facts described herein are taken from the complaint, the statements of material facts and responses submitted by the parties in conjunction with this motion, and all other pleadings and memorandums of law filed in this lawsuit.  Where a factual dispute exists, the Court has so noted.

northbound on Interstate 390 ("I-390") near Exit 9 behind a vehicle that was traveling erratically, swerving, and repeatedly leaving its designated lane of travel. (Dkt. No. 43-24, ¶13; Dkt. No. 43-28, ¶4; Dkt. No. 52, ¶10) The caller identified the make and model of the vehicle in question as a "black Chevy Chevarado." (Dkt. No. 43-29; Dkt. No. 52, ¶11; Dkt. No. 53, ¶13) The caller remained on the phone for approximately four minutes with Dispatcher Mumm, during which time she watched the black Chevrolet and described the operator's erratic driving. (Dkt. No. 43-29; Dkt. No. 43-24, ¶13, ¶15; Dkt. No. 43-24, ¶4) Specifically, the caller indicated that the vehicle had "almost taken out a couple people", had "almost gone out into the median", and had "almost took out a semi." (Dkt. No. 43-29) The caller provided Dispatcher Mumm with her name, phone number, home address, and the make and model of the vehicle she was traveling in.[4] (Dkt. No. 43-24, ¶14; Dkt. No. 43-29) The caller attempted to provide Dispatcher Mumm with the Chevrolet's license plate number, but had some difficulty reporting the number because she was afraid to travel close to the Silverado on account of its erratic movements. (Dkt. No. 43-29; Dkt. No. 52, ¶¶22-24) The caller stated that she believed the license plate

---

[4] Plaintiffs contend that the 911-caller stated that her first name was Heather and provided the spelling of her last name as either "Krellman" or "Krellmen". (Dkt. No. 52, ¶¶15-16; Dkt. No. 53, ¶13) Plaintiffs further submit that the caller told Dispatcher Mumm that she lived at "748 Carrots Drive" in Lindley, New York. (Dkt. No. 52, ¶¶18-20; Dkt. No. 53, ¶¶13-14) Plaintiffs contend that no such road exists in Lindley, New York, and that no individual named "Krellman" or "Krellmen" resides at this address. (Id.) Plaintiffs also note that the caller stated that she was traveling in a "tan Toyota Solora", and suggest that no such make or model of car exists. (Dkt. No. 53, ¶13) In contrast, defendants assert that the caller informed Mumm that her last name was spelled "Creelman", and that she resided at "748 Carriage Drive", not Carrots Drive. (Dkt. No. 59, ¶3) Defendants also provide internet search results showing that an individual by the name of "Heather Creelman" resides at 748 Carriage Drive in Lindley, New York. (Dkt. No. 59, ¶3, Exhs. A and B) Defendants speculate that any reference to "Krellmen" or "Carrots Drive" in Dispatcher Mumm's notes is merely a transcribing error. (Dkt. No. 59, ¶3) Defendants further submit that the caller indicated that she was traveling in a tan Toyota Solara, but that she misspelled or misstated the model of the car as "Solora." (Dkt. No. 59, ¶6) An audio recording of the 911-call on September 21, 2016 was submitted as an exhibit to defendants' motion. (Dkt. No. 43-29) The Court has listened to the recording and finds that it is not entirely clear, from the audio provided, whether the caller spelled her name as "Krellman", "Krellmen", or "Creelman" nor is it entirely clear whether the name of the street she provided for her residence was "Carriage" or "Carrots". (Id.) However, for the reasons discussed more fully infra, these disputes of fact are not material to the legal conclusions reached by the Court.

number to be "22768GL".[5]  (Dkt. No. 43-29)  The caller then informed Mumm that the vehicle exited the I-390 at Exit 10 and turned right.  (Dkt. No. 43-24, ¶18; Dkt. No. 43-29)

Dispatcher Mumm relayed the information provided by the 911-caller to Brandan J. Flicker, a Livingston County Sheriff's Deputy.  (Dkt. No. 43-24, ¶23; Dkt. No. 43-28, ¶5; Dkt. No. 53, ¶23)  Mumm also logged the information provided by the caller into a computer aided dispatch ("CAD") system, and that information was made available in "real time" to Deputy Flickner.  (Dkt. No. 43-24, ¶24; Dkt. No. 43-28; ¶6; Dkt. No. 43-26, ¶27)  Specifically, the CAD report received by Flickner reflects that a 911-caller reported a "black Chevy Silverado all over the [road]."  (Dkt. No. 43-30, pg. 2)  Deputy Flicker, who was on road patrol at that time, was dispatched to the area to investigate.  (Dkt. No. 43-24, ¶23)  Deputy Flickner's Incident Report from September 21, 2016 notes that he was "dispatched to the area of Interstate 390 northbound in the Town of Avon for the black Silverado traveling north all over the roadway."  (Dkt. No. 43-3, pg.3)  Flickner testified that he took this to mean the vehicle was not staying in its lane.  (Dkt. No. 43-2, pg. 20)

A dashboard camera ("dashcam") video taken from Deputy Flickner's police vehicle on September 21, 2016 was submitted as an exhibit in support of defendants' motion.  (Dkt. No. 43-23; Dkt. No. 43-26, ¶¶28-29)  The dashcam video includes visual footage from the time Deputy Flickner first received the 911-call for erratic driving through the time of Dobson's arrest.  (Dkt. No. 43-23)  The video does not include audio.  (*Id.*)  The dashcam video shows Flickner driving to the area in question immediately after receiving the report of erratic driving.  (Dkt. No. 43-23; Dkt. No. 43-24, ¶26)  As he

---

[5] The license plate number of the vehicle driven by Dobson on the day of stop and arrest was "227688GL".  (Dkt. No. 52, ¶56)

approached Exit 10 of the I-390 on E Avon Lima Road a few minutes later, Deputy Flickner was informed over dispatch that the black Chevrolet Silverado had taken Exit 10 off the I-390. (Dkt. No. 43-24, ¶26; Dkt. No. 43-3, pg. 3)

*Deputy Flickner's Account of the Stop*

Consistent with the information he was receiving over dispatch, Deputy Flickner arrived at Exit 10 and observed a black Chevrolet Silverado exit the I-390 and turn right onto E Avon Lima Road. (Dkt. No. 43-3, pg. 3; Dkt. No. 43-23) Flickner pulled up behind the Silverado and observed one or two Caterpillar heavy equipment ("CAT") stickers affixed to the back window of the vehicle, which he noted was a violation of the Section 375(1)(b) of the New York State Vehicle and Traffic Law.[6] (Dkt. No. 43-2, pgs. 122, 125; Dkt. No. 43-3, pg. 3) At that time, Flickner intended to initiate a stop of the Silverado. (Dkt. No. 43-3, pg. 3) However, before he was able to activate the flashing lights of his police vehicle, Flickner observed the Silverado begin to pull over to the side of the road. (Dkt. No. 43-2, pg. 122, 125; Dkt. No. 43-3, pg. 3) Deputy Flickner then activated his vehicle's flashing lights and informed dispatch that he was engaging in a traffic stop. (Dkt. No. 43-3, pg. 3) During his deposition, Flickner testified that he "wanted to be sure [the driver] was all right to continue to drive." (Dkt. No. 43-2, pg. 125) Deputy Flickner further testified that because he observed the CAT sticker while the driver of the Silverado was already in the process of pulling over to the side of the road, and because the sticker constituted a traffic violation, Flickner believed he could "then detain [the driver] if he wanted to leave." (Dkt. No. 43-2, pg. 125)

---

[6] Dobson admitted, during his deposition, that the vehicle he was driving on September 21, 2016 had at least one "CAT" sticker on the rear windshield. (Dkt. No. 43-12, pg. 55) In addition, the dashcam video shows a "CAT" sticker to be visible on the rear window of the Silverado at the time Deputy Flickner first pulls up behind the vehicle in response to the 911-call. (Dkt. No. 43-23)

*Jeffrey Dobson's Account of the Stop*

Jeffrey Dobson was traveling northbound on the I-390 at approximately 2:45 p.m. on September 21, 2016.  (Dkt. No. 52, ¶1, ¶5)  Dobson was driving a black Chevrolet Silverado which was registered to Dobson's father, but regularly driven by Dobson's son. (Dkt. No. 52, ¶6; Dkt. No. 43-11, pg. 84)  At that time, Dobson was driving to a farm in East Bloomfield, New York to retrieve a tractor for his employer.  (Dkt. No. 52, ¶2) Dobson was unfamiliar with the area, and Dobson's employer told Dobson to drive to Exit 10 on the I-390 and then call for more specific directions.  (Dkt. No. 52, ¶4)  As instructed, Dobson exited the I-390 and pulled over to the side of the road in order to telephone his employer and receive more specific directions as to where he was going to retrieve the tractor.  (Dkt. No. 43-11, pg. 87; Dkt. No. 43-12, pg. 53)  After pulling the Silverado over to the side of the road and retrieving his phone, Dobson observed a Livingston County Sheriff's police vehicle pull up behind him and activate its flashing lights.  (*Id.*)

Plaintiffs submit that while driving north on I-390, Dobson observed other vehicles driving erratically in front of him.  (Dkt. No. 50, ¶5)  Plaintiffs also submit the dashcam video shows Flickner pass two other black pick-up trucks traveling east before encountering Dobson.  (Dkt. No. 52; ¶¶39-40, ¶¶43-44)

*Deputy Flickner's Initial Encounter with Dobson*

Deputy Flickner approached the driver-side window of the Silverado, and Dobson identified himself as the driver of the vehicle.  (Dkt. No. 43-24, ¶33; Dkt. No. 53, ¶33) Flickner asked Dobson why his vehicle would be involved in a traffic complaint of a black Chevrolet Silverado traveling erratically on I-390.  (Dkt. No. 43-24, ¶33; Dkt. No. 53, ¶34; Dkt. No. 43-3, pg. 4)  Dobson admitted that he was having difficulty controlling his vehicle

7

on the I-390 by explaining that there was a problem with the Silverado's steering. (Dkt. No. 43-11, pg. 89-90; Dkt. No. 43-12, pg. 54; Dkt. No. 43-24, ¶35) Dobson then gestured to the steering wheel in an attempt to demonstrate the issue for Flickner. (Dkt. No. 43-11, pg. 89) During his deposition, Dobson admitted that, while driving on the I-390 prior to the stop, "a couple of times [he] went off onto the rumble strips" and that he had drifted toward the left-hand lane where another car beeped at him. (Dkt. No. 43-11, pg. 90, 92; Dkt. No. 53, ¶36) Dobson then asked Flickner if he was traveling in the right direction to reach Bloomfield, New York. (Dkt. No. 43-2, pgs. 31-32, 34; Dkt. No. 43-13, pg. 11; Dkt. No. 43-11, pg. 94) Deputy Flickner asked Dobson if he had taken any alcohol or drugs, and Dobson answered that he had not. (Dkt. No. 52, ¶85)

Deputy Flickner is a certified Drug Recognition Expert, which qualifies him to evaluate and determine whether a suspect is impaired by drugs. (Dkt. No. 43-24, ¶38; Dkt. No. 43-26, ¶3) To achieve this certification, Flickner took an intensive, seven-day course on how to appropriately and accurately assess whether an individual is under the influence of drugs. (Dkt. No. 43-24, ¶42; Dkt. No. 43-26, ¶¶7-8) The class consisted of daily quizzes and tests, all of which Flickner was required to pass. (Dkt. No. 43-24, ¶43; Dkt. No. 43-26, ¶7) Flickner was also required to successfully conduct twelve in-person drug evaluations on individuals suspected of being impaired. (Dkt. No. 43-24, ¶¶44-45) Lastly, he was required to pass a four-hour, written, final examination. (Dkt. No. 43-24, ¶46) Deputy Flickner estimates that, in the course of his career, he has been involved in approximately 1,000 arrests for driving while intoxicated or under the influence. (Dkt. No. 43-24, ¶127)

During his initial conversation with Dobson, Deputy Flickner observed that Dobson spoke softly.  (Dkt. No. 43-24, ¶37; Dkt. No. 43-2, pgs. 24-25; Dkt. No. 43-3, pgs. 3-4)  Deputy Flickner knew from his training that certain drugs can cause a person's tone and volume of voice to be temporarily altered.  (Dkt. No. 43-26, ¶22)  In contrast, plaintiffs submit that Dobson was not nervous and that he was speaking in a normal tone of voice. (Dkt. No. 53, ¶37)  Deputy Flickner observed that Dobson's eyes were watery and bloodshot.  (Dkt. No. 43-2, pgs. 24-25; Dkt. No. 43-3, pgs. 3-4; Dkt. No. 43-24, ¶37) Likewise, Dobson acknowledged that his eyes may have appeared bloodshot at the time of the stop.  (Dkt. No. 43-12, pg. 58)  In fact, Dobson was asked during his deposition if his eyes were bloodshot when speaking to Deputy Flickner and Dobson responded, "[i]t was dusty conditions, so I would think so."  (Id.)  Dobson also testified that when questioned by defendants as to why his eyes were bloodshot, he explained that he was working with hay, which contains dirt and dust, and that he had been "driving next to dust for 20 hours a day [and] your eyes get red."[7]  (Dkt. No. 43-11, pg. 111)

Deputy Flickner further noted that Dobson had rancid breath.  (Dkt. No. 43-2, pg. 74)  Based on his training, Flickner was aware that certain drugs can cause dry mouth, which in turn can cause a rancid breath odor.  (Id.)  Plaintiffs dispute that Dobson's

---

[7] Plaintiffs now assert that whether Dobson's eyes appeared bloodshot at the time of the stop is a disputed issue of fact.  In fact, Dobson has submitted an affidavit in opposition to defendants' motion stating that his eyes did not appear watery or bloodshot on September 21, 2016.  (Dkt. No. 50, ¶28, ¶33) Plaintiffs point to a video from the backseat of Flickner's police vehicle and argue that Dobson's eyes do not appear bloodshot in the footage.  (Dkt. No. 49, Exh. F)  In light of Dobson's prior sworn testimony admitting that his eyes may have appeared bloodshot to the officers, and offering an explanation as to why they may have appeared bloodshot, the Court does not accept Dobson's belated assertion that the appearance of his eyes is a disputed issue of fact.  "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120 (2d Cir. 1987).  *See also Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.")

9

breathe had a rancid odor. (Dkt. No. 53, ¶51) Deputy Flickner noted that Dobson's pupils were constricted. (Dkt. No. 43-2, pgs. 24-25; Dkt. No. 43-24, ¶37; Dkt. No. 43-3, pgs. 3-4) Flickner knew from his training both how to determine whether an individual's pupils are constricted, and that constricted pupils can be caused by narcotic analgesics. (Dkt. No. 43-24, ¶50) Plaintiffs do not dispute that Dobson's pupils were constricted or that constricted pupils can be caused by narcotic analgesics. (Dkt. No. 53, ¶50) However, plaintiffs submit that constricted pupils can also be caused by sunlight. (Id.)

According to his DRE training and experience, Deputy Flickner found Dobson's manner of speech, bloodshot and watery eyes, constricted pupils, breath odor, and the fact that Dobson did not know if he was traveling in the right direction, to be signs of impairment. [8] (Dkt. No. 43-26, ¶¶20-24) As a result of these observations, Flickner asked Dobson to exit the vehicle to determine if he was competent to drive. (Dkt. No. 43-2, pgs. 34, 36; Dkt. No. 43-3, pg. 4)

_Roadside Field Sobriety Tests_

When Dobson exited the Silverado, Deputy Flickner observed Dobson use the door to help balance or steady himself. (Dkt. No. 43-12, pg. 36; Dkt. No. 43-3, pg. 4) In contrast, plaintiffs submits that Dobson did not use his vehicle door to steady himself.[9] (Dkt. No. 50, ¶21) After Dobson exited his vehicle, Flickner asked Dobson to undergo a series of roadside field sobriety tests to determine if he was intoxicated or impaired, and

---

[8] Defendants submit that when Dobson told Deputy Flickner that he was looking for Bloomfield, New York, he informed Flickner that he was driving there for work. (Dkt. No. 43-24, ¶53) Flickner testified that he found it suspicious that Dobson was traveling somewhere for work but did not know if he was going in the right direction. (Dkt. No. 43-2, pgs. 31-32) Dobson disputes the fact that he told Flickner he was going to Bloomfield, New York for work. (Dkt. No. 53, ¶53) However, Dobson _does not dispute_ that he asked Flickner if he was traveling in the right direction to reach Bloomfield, New York. (Id.)
[9] It cannot be seen in the dashcam video whether Dobson used the door to steady himself when exiting his vehicle. (Dkt. No. 43-23)

Dobson agreed.  (Dkt. No. 43-24, ¶54; Dkt. No. 53, ¶54)  Flickner first asked Dobson if he had any disabilities which interfered with his daily activities, and Dobson informed Flickner that he did not.[10]  (Dkt. No. 50, ¶24)  Deputy Flickner then gave Dobson directions as to how each test was to be performed, and Flickner physically demonstrated to Dobson how to perform the tests.  (Dkt. No. 43-24, ¶56; Dkt. No. 43-3, pg. 5)  Flickner indicates in his Incident Report that Dobson affirmed that he understood all directions before performing each test.  (Dkt. No. 43-3, pg. 5)  In contrast, Dobson submits that he had "serious issues" understanding some of the instructions provided by Flickner, and that Flickner's instructions were generally unclear.  (Dkt. No. 53, ¶56, ¶59)  Dobson submits that, at certain times, he needed to request clarification mid-test, and that this confusion "disrupted his performance on the tests."   (Id.)  The dashcam video, which does not include audio, appears to be consistent with Flickner's account.  (Dkt. No. 43-23)  Specifically, the video shows Flickner talking and gesturing to Dobson prior to Dobson performing each test.  (Id.)  The video also shows Flickner physically demonstrating various actions to Dobson prior to Dobson performing some of the tests.  (Id.)

Deputy Flickner first performed a horizontal gaze nystagmus test on Dobson.  (Dkt. No. 43-3, pg. 5; Dkt. No. 43-2, pg. 39)  Flickner found that, pursuant to the horizontal gaze nystagmus test, Dobson did not present any signs of being under the influence of alcohol, a depressant inhalant or a dissociative anesthetic.  (Dkt. No. 43-2, pg. 39)  Flickner then

---

[10] The parties agree that while Dobson first told Deputy Flickner that he did not have any disabilities which interfere with his daily activities, Dobson later told Flickner, in the course of performing the field sobriety tests, that he had a sprained right ankle. (Dkt. No. 50, ¶24; Dkt. No. 43-3, pg. 5) The undisputed facts show that Flickner took this information into account in assessing Dobson's performance on the tests. Dobson testified that when performing a test which required him to stand on one foot, he "did [not] do [his] right foot because [he] had a sprained ankle." (Dkt. No. 43-12, pg. 51; Dkt. No. 43-11, pg. 99) Dobson further testified that Flickner informed him that he would "give him the benefit of the doubt" with respect to the portion of the test he was unable to complete because of the right ankle sprain. (Dkt. No. 43-12, pg. 57)

had Dobson perform a walk and turn test. (Dkt. No. 43-26, ¶12)  During the walk and turn

test, Flickner observed that Dobson exhibited four out of eight "clues" of being impaired.[11]

(Dkt. No. 43-26, ¶12; Dkt. No. 43-2, pg. 39)  Specifically, Dobson was unable to keep his

balance, missed several heel-to-toe steps, failed to leave his lead foot on the line in the

roadway as instructed by Flickner, and stepped off the line.  (Dkt. No. 43-26, ¶12; Dkt.

No. 43-24, ¶¶61-62; Dkt. No. 43-3, pg. 5)  Flicker also noted that, during the instructional

phase of the test, Dobson became so off-balance that he had to remove his foot from the

line two times to prevent himself from falling over.  (Dkt. No. 43-3, pg. 5)  Deputy Flickner

further administered a one leg stand test, which he also determined that Dobson failed.

(Dkt. No. 43-26, ¶14; Dkt. No. 43-3, pg. 6)  During the one leg stand test, Flickner noted

that Dobson was swaying, using his arms for balance, hopping in order to retain his

balance, and experiencing body and leg tremors.  (Dkt. No. 43-26, ¶16; Dkt. No. 43-24,

¶64; Dkt. No. 43-3, pg. 6)  Deputy Flickner also performed a modified Romberg balance

test to measure Dobson's internal clock since, according to Flickner's training, a slow

internal clock can be caused by drug and alcohol consumption.[12]  (Dkt. No. 43-26, ¶18)

In performing the modified Romberg balance test, Dobson estimated the passage of 30

seconds to occur at 38 seconds, which is outside the acceptable five second deviation.

(Dkt. No. 43-26, ¶19; Dkt. No. 43-3, pg. 6)  Deputy Flickner also noted in his Incident

Report that Dobson was experiencing eyeball tremors.  (Dkt. No. 43-3, pg. 6)  In sum,

[11] A "clue" is a suspect's behavior or action exhibited during a test that indicates impairment.  (Dkt. No. 43-26, ¶9)  According to Deputy Flickner's training, when a suspect exhibits two out of eight "clues" during a test, there is a 79% probability that the suspect is impaired.  (Dkt. No. 43-26, ¶¶10-11)
[12] Flickner also notes that a slow internal clock can be very dangerous when operating a motor vehicle, because it causes a slow reaction time.  (Dkt. No. 43-26, ¶18)

Flickner found that Dobson failed three out of the four field sobriety tests he administered. (Dkt. No. 43-24, ¶78; Dkt. No. 43-3, pgs. 5-6)

Dobson admits that he failed the modified Romberg balance test by failing to accurately estimate the passage of 30 seconds within the acceptable five second deviation. (Dkt. No. 53, ¶71, ¶72) During his deposition, Dobson admitted that he stumbled or "swayed" during the one leg stand test, and that he had to keep his arms up to retain his balance. (Dkt. No. 43-12, pg. 55-57) Likewise, the dashcam video shows Dobson stumbling, swaying, and generally struggling with his balance at various times while performing the field sobriety tests. (Dkt. No. 43-23) Specifically, the video shows Dobson having difficulty both walking in a straight line and standing on one leg. (Id.) The video also shows Dobson to experience body tremors while taking the tests. (Id.) Despite Dobson's admissions during his deposition and the footage from the dashcam video, plaintiffs dispute Deputy Flickner's finding that Dobson failed both the walk and turn test and the one leg stand test. (Dkt. No. 53, ¶66, ¶70, ¶78, ¶79) Instead, Dobson claims that he "believes he successfully completed both tests." (Id.)

*Dobson's Arrest*

Based upon his assessment of Dobson's performance during the field sobriety tests, as well as his other observations regarding Dobson's physical appearance and demeanor, Deputy Flickner arrested Dobson for operating a motor vehicle under the influence of drugs in violation Section 1192 of the New York State Vehicle and Traffic law.[13] (Dkt. No. 43-24, ¶79; Dkt. No. 43-2, pg. 41) Flickner also issued Dobson traffic

---

[13] During the course of the stop, Dobson submitted to a roadside Alco-sensor test, which was negative for the presence of alcohol. (Dkt. No. 43-2, pg. 41)

tickets for driving while ability impaired by drugs and for use or placement of stickers on his windshield or rear windshield.  (Dkt. No. 43-2, pgs. 64-65)

Following his arrest, Dobson was taken to the Livingston County Sheriff's Station to undergo a second drug evaluation.  (Dkt. No. 43-24, ¶84)  James Merrick, a sergeant with the Livingston County Police Department, conducted the drug recognition evaluation at the station.[14]  (Dkt. No. 43-24, ¶85)  Sergeant Merrick asked Dobson questions; analyzed Dobson's pupils; measured Dobson's pulse; and took Dobson's blood pressure. (Dkt. No. 43-24, ¶86)  Based on his training and experience, Merrick found that Dobson's pupil size, pulse rate, and blood pressure were all consistent with that of an individual under the influence of a narcotic.  (Dkt. No. 43-24, ¶¶96-98, ¶¶100-101)  Merrick also had Dobson repeat the walk and turn test, the modified Romberg balance test, and the one leg stand test.  (Dkt. No. 43-24, ¶86; Dkt. No. 43-25, ¶20, ¶23, ¶25, ¶31; Dkt. No. 53, ¶86) Many of Merrick's observations and findings on those tests were consistent with those of Flickner.  (Dkt. No. 43-24, ¶87; Dkt. No. 43-25, ¶¶22-24, ¶27, ¶30, ¶32; Dkt. No. 53, ¶87) Specifically, on the walk and turn test, Merrick found that Dobson was unable to keep his balance, missed several heel-to-toe steps, and stepped off the line.  (Dkt. No. 43-24, ¶91; Dkt. No. 43-25, ¶23)  On the one leg stand test, Merrick noted that Dobson swayed, used his arms for balance, and hopped.[15]  (Dkt. No. 43-24, ¶93; Dkt. No. 43-25, ¶27)  During the modified Romberg balance test, Merrick noted that Dobson took 45 second to estimate that 30 seconds had passed, showing that his internal clock had slowed significantly.  (Dkt. No. 43-24, ¶94; Dkt. No. 43-25, ¶23)  Consistent with Deputy Flickner's

---

[14] Merrick is also a Certified DRE Expert, and underwent the same training as Deputy Flickner.  (Dkt. No. 43-25, ¶3)
[15] In contrast, Dobson submits that he performed both the walk and turn test and the one leg stand test in the manner directed by Merrick, without any mis-steps or balance issues.  (Dkt. No. 53, ¶¶92-93)

findings, Sergeant Merrick also observed Dobson exhibit eyelid and body tremors. (Dkt. No. 43-25, ¶30; Dkt. No. 43-24, ¶88; Dkt. No. 53, ¶88) Based on Dobson's responses to all of the tests performed, Sergeant Merrick concluded that Dobson was under the influence of both a narcotic analgesic and a CNS stimulant. (Dkt. No. 43-25, ¶36; Dkt. No. 43-24, ¶103)

Following the DRE evaluation, Sergeant Merrick had no further involvement in the arrest, detention, or prosecution of Dobson. (Dkt. No. 43-24, ¶104; Dkt. No. 43-25, ¶37) Merrick did not appear in court, testify in any proceedings, or attempt to persuade any prosecutor to pursue any charges against Dobson. (Dkt. No. 43-25, ¶¶38-39)

### *Criminal Proceedings*

Following the DRE evaluation by Merrick on September 21, 2016, Dobson was transferred to the Livingston County Jail. (Dkt. No. 43-24, ¶105, ¶107) He spent the night there and was arraigned the following morning, on September 22, 2016, before Judge Peter Piampiano of Avon Town Court. (*Id.*) Dobson was released following his arraignment. (Dkt. No. ¶108) On December 20, 2016, Dobson appeared in Avon Town Court for a probable cause hearing. (Dkt. No. 43-24, ¶¶109-110; Dkt. No. 43-11, pg. 138; Dkt. No. 52, ¶134) During the probable cause hearing, it was noted that the analysis of the urine sample provided by Dobson on the date of his arrest had not yet been returned from the lab. (Dkt. No. 43-24, ¶112) The hearing was adjourned to January 17, 2017 to account for the disclosure of Deputy Flickner's dashcam video and to obtain the toxicology report from the urine sample. (Dkt. No. 43-11, pg. 44; Dkt. No. 52, ¶134) On December 27, 2016, all charges against Dobson were dismissed by the Avon Town Court.

(Dkt. No. 43-11, pg. 138; Dkt. No. 52, ¶135)  Dobson received notice of the dismissal of the charges through the mail.  (*Id.*)

Deputy Flickner testified at the probable cause hearing.  (Dkt. No. 43-24, ¶111; Dkt. No. 43-26, ¶34)  Following his testimony at the hearing, Flickner had no further involvement in the case.  (Dkt. No. 43-26, ¶¶32-34)  Flickner did not have any conversations with anyone from the District Attorney's office concerning the charges against Dobson, nor did he attempt to persuade any prosecutor to pursue the charges against Dobson.  (*Id.*)

## DISCUSSION

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56.  A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate."  *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991); *see also Matsushia Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (summary judgment is appropriate when "the record as a whole could not lead a rational trier of fact to find for the non-moving party").  When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact.  *Linares v. McLaughlin*, 423 Fed.

16

Appx. 84, 86 (2d Cir. 2011); *see also Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2007) (an issue of fact is considered "material" if it "might affect the outcome of the suit under the governing law").

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). *See e.g., Gottlieb v. County of Orange*, 84 F.3d 511, 519 (2d Cir. 1996) (opposing party cannot defeat summary judgment motion by "relying on the allegations in his pleading…or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.")

### *Probable Cause is a Complete Defense to Dobson's Claims Against Defendants*

The claims presently before this Court include false arrest, false imprisonment, and malicious prosecution against Flickner and Merrick, all stemming from Dobson's detention and arrest on September 21, 2016. "[T]he existence of probable cause is a complete defense to a civil rights action arising from an arrest, whether brought under state law or Section 1983." *Brown v. Ontario Cnty.*, 787 F. Supp. 2d 273, 275 (WDNY 2011); *quoting Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Therefore, the existence of reasonable suspicion and/or probable cause during Dobson's stop, detention and arrest on September 21, 2016 would serve as a complete bar to all of plaintiffs' federal and state

17

claims against defendants Flickner and Merrick, and would require dismissal of the complaint.  *See Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) ("[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff . . . must prove . . . lack of probable cause for commencing the proceeding [and] the existence of probable cause is a complete defense to a claim of malicious prosecution in New York."); *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (probable cause is considered a complete defense to a false-arrest claim under either state or federal law); *Blackmon v. McKimmie*, 18-CV-650, 2019 U.S. Dist. LEXIS 195432 (WDNY Nov. 7, 2019); *accord Zanghi v. Incorp. Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985) ("Where there was probable cause for the arrest, the confinement becomes privileged and that probable cause finding is a complete defense to a false imprisonment action.") The Court has considered the undisputed facts in the light most favorable to plaintiffs and finds, for the reasons outlined below, that all of defendants' actions on September 21, 2016 were supported by reasonable suspicion and/or probable cause, and therefore plaintiffs' claims fail as a matter of law.[16]

> ### *The Initial Stop Was Supported by Reasonable Suspicion and/or Probable Cause*

An ordinary traffic stop is a limited seizure pursuant to the Fourth Amendment. *See United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994).  In order to justify a traffic stop, an officer must have either "probable cause or reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *United States v, Gaines*, 457 F.3d 238, 243 (2d Cir. 2006).  Thus, "[t]raffic stops are presumptively reasonable under the

---

[16] Plaintiff Shannon Dobson's loss of consortium claim should be dismissed for the same reasons the Court is recommending dismissal of Jeffry Dobson's underlying claims. *See Kravtov v. Town of Greenburgh*, 10-CV-3142, 2012 WL 2719663, at *22 (SDNY July 9, 2012) ("A loss of consortium claim is a derivative action that depends on the viability of the primary cause of action or underlying injury.")

Fourth Amendment if the officer has probable cause to believe that a traffic infraction occurred." *United States v. Foreste*, 780 F.3d 518, 532 (2d Cir. 2015); *see also United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) ("[T]raffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity.")

Here, the undisputed facts demonstrate that, at the time of the stop, Deputy Flickner had reasonable suspicion and/or probable cause to believe that Dobson committed traffic infractions. It is undisputed that Flickner received information from Dispatcher Mumm that a black Chevrolet Silverado was driving erratically or "traveling all over the roadway" on I-390 near Exit 10. In fact, Flickner was provided with information of the vehicle's erratic movements, in "real time", through the CAD system. Flickner was told the make and model of the vehicle as well as the precise location where the vehicle exited the interstate. It is undisputed that when Flickner arrived on the scene a few minutes later, he observed a black Chevrolet Silverado, which fit the description provided by the 911-caller, exit the I-390 at the exact location reported by the caller.[17] Moreover, when Deputy Flickner pulled up behind Dobson's vehicle, he observed "CAT" stickers on the rear window, which he recognized to be a violation of the Section 375(1)(b) of the New York State Vehicle and Traffic Law. *See People v. Pealer*, 89 A.D.3d 1504, 1506 (4th Dept. 2011) (an unauthorized sticker on a rear window provides probable cause for

---

[17] Contrary to plaintiffs' contention, the Court finds it of no consequence that the 911-caller initially referred to the black Chevrolet Silverado traveling erratically as a "Chevy Chevarado." The Court has reviewed both the audio recording of the 911-call and the CAD report from September 21, 2016, and it is clear from this evidence that Dispatcher Mumm understood the caller to be describing a black Chevrolet *Silverado*, despite the fact that she pronounced it "Chevarado." Furthermore, it is undisputed that Deputy Flickner was looking for a black Chevrolet Silverado when he responded to the 911-call reporting erratic driving and that Dobson was driving a 2005 black Chevrolet Silverado at the time of the stop.

a traffic stop). Thus, when Flickner initiated the stop, he had reasonable suspicion and/or probable cause to believe, based on both the information provided by the 911-caller and his own observations, that Dobson had committed the traffic infractions of (1) driving recklessly or erratically; and (2) having unauthorized rear window stickers. *See Gatling v. West*, 6:18-cv-0275, 2020 U.S. Dist. LEXIS 18749 (NDNY Feb. 5, 2020) (reasonable suspicion existed to conduct a traffic stop where a 911-caller reported that a grey Chevy Impala was driving erratically on a specific portion of eastbound Interstate 88, an officer confirmed the presence of a Chevy Impala on that portion of the highway, and the officer then witnessed the separate traffic infraction of following too closely).[18]

The Court rejects plaintiffs' argument that it was unreasonable for Deputy Flickner to rely on information provided during the 911-call because "the validity, accuracy, authenticity and reliability of the 911 call are all in dispute." The Supreme Court has held that a police officer may rely on a 911-call when the call is: (i) made by an eyewitness, (ii) nearly contemporaneous with the event; and (iii) recorded and traced by the 911 system. *Navarette v. California*, 571 U.S. 393, 398-401 (2014). The call here readily satisfies each of these requirements. It is undisputed that the caller provided a first-hand, contemporaneous account of erratic driving by the operator of the black Chevrolet Silverado. In fact, she remained on the phone for four minutes with Dispatcher Mumm during which time she described how the black Chevrolet Silverado was not staying in its

---

[18] The Court also rejects plaintiffs' argument that there were other vehicles fitting the description provided by the 911-caller driving erratically that Flickner should have investigated or pursued. To begin, none of the pick-up trucks depicted on the dashcam video, aside from the one driven by Dobson, appear to be black Chevrolet Silverado's. Moreover, unlike Dobson's vehicle, none were in the location precisely described by the 911-caller. Finally, Flickner was not required to investigate every potential vehicle which may have fit the description given by the 911-caller before stopping Dobson. It is sufficient that Dobson's vehicle exactly matched the description and location provided in the call. *See Krause v. Bennett*, 887 F.2d 362 (2d Cir. 1989) (police need not investigate every lead prior to arresting a suspect, nor are they required to establish the suspect's guilt beyond a reasonable doubt).

designated lane of travel and had almost hit other vehicles. It is undisputed that the caller provided specific details, including the make and model of the vehicle, a portion of its license plate number, and its exact location. It is further undisputed that the call was recorded and traced by the 911 system, and that the caller provided her name, address, phone number, and the make and model of the vehicle she was traveling in. *See Navarette*, 572 U.S. at 396-97 ("an anonymous 911 call can provide a police officer with adequate reasonable suspicion to conduct an investigatory stop"). [19] Importantly, the caller's information was independently corroborated by Flickner, who encountered the exact make and model of car reported in the call, exiting the interstate at the precise location given by the caller. For these reasons, it was reasonable for Deputy Flickner to rely on the information provided by the 911-caller in stopping Dobson to investigate the erratic driving complaint. *See United States v. Rivera*, 353 Fed. Appx. 535, 536 (2d Cir. 2009) ("Reasonable suspicion can be based solely on an informant's tip if there is sufficient indicia of reliability under a 'totality of circumstances' test."); *United States v. Gonzalez*, 555 F.2d 308, 311 (2d Cir. 1977) ("[A]n informant whose present information is found to be truthful by independent corroboration of the essential elements of his information can establish probable cause [and] [t]he corroborating evidence need not, of

---

[19] The Court rejects plaintiffs' argument that the 911 call was unreliable because the caller may have provided an inaccurate spelling of her name, or a residence which did not match the address given. To begin, there is no affirmative evidence before the Court that the caller purposefully provided an inaccurate name or address. More importantly, there is no evidence that Mumm or Flickner had any reason to believe, at the time of the call, that the caller's identifying information was reported falsely. In fact, it is the caller's use of 911 system, in and of itself, that provides an indica of reliability to the information. *Navarette*, 572 U.S. at 400-01; *accord Fla. V. J.L.*, 529 U.S. 266, 276 (2000) ("A 911 call has some features that allow for identifying and tracing callers, and thus provides some safeguards against making false reports with impunity.") Moreover, provided there is reasonable suspicion or probable cause to make a stop in light of all the attending circumstances, an officer is not required to independently confirm a caller's personal identifying information before acting on information reported during a 911-call. *Navarette*, 572 U.S. at 401 ("The caller's *use of the 911 system* is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call.") (emphasis added).

course, establish the crime itself, corroboration of innocent elements is enough.")[20]

_The Extension of the Traffic Stop was Supported by Reasonable Suspicion and/or Probable Cause_

"A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." _United States v. Foreste_, 780 F.3d 518, 524 (2d Cir. 2015); _accord United States v. Glover_, 957 F.2d 1004 (2d Cir. 1992). _See also Terry v. Ohio_, 392 U.S. 1, 30 (1968) (police may seize and detain a suspect if they have reasonable suspicion that "criminal activity may be afoot"). In assessing whether reasonable suspicion exists, courts are to consider the totality of the circumstances, and "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." _United States v. Arvizu_, 534 U.S. 266, 273 (2002).

Here, Deputy Flickner had reasonable suspicion to extend the scope of the traffic stop to investigate whether Dobson was driving while impaired by drugs or alcohol. It is undisputed that upon approaching the vehicle, Flickner questioned Dobson about the complaint regarding his black Chevrolet Silverado driving erratically on the I-390. It is undisputed that Dobson immediately indicated that there was a problem with his vehicle's

---

[20] The Court notes that even if it was unreasonable for Deputy Flickner to rely on the 911-call in his decision to stop Dobson, which it was not, the traffic stop would still be supported by reasonable suspicion and/or probable cause because the undisputed facts reflect that the "CAT" sticker affixed to Dobson's window, which was visible at the time Flickner pulled up behind him, was an independent violation of New York State Vehicle and Traffic Law. _See U.S. v. Lucas_, 338 F. Supp. 3d 139, 157 (WDNY 2018) (because tinted windows provided probable cause for the stop, the court did not need to decide if reasonable suspicion of narcotic trafficking "independently justified the initial stop").

steering, and thus admitted to Flickner that he was having difficulty controlling his black Chevrolet Silverado while driving on the I-390. Therefore, it was clear to Flickner, at that time, that Dobson had been driving erratically on the I-390 as reported by the 911-caller. It is further undisputed that Flickner made the following additional observations: (1) Dobson was confused as to which direction he was traveling in; (2) Dobson's pupils were constricted; and (3) Dobson's eyes were bloodshot and watery. Flickner, a Certified Drug Expert who has been involved in approximately 1,000 arrests for driving while impaired or under the influence, recognized these to be potential signs of impairment.[21] Based upon the totality of these circumstances viewed in the context of Flickner's experience and training, it was reasonable for Flickner to extend the stop and request that Dobson undergo a roadside field sobriety test.

Plaintiffs argue that Deputy Flickner's conduct was unreasonable because even though Flickner may have been permitted to stop Dobson's vehicle on account of the rear window stickers, Flickner had a "pre-determined purpose to investigate a report of a vehicle driving all over the highway." The Court rejects this argument. As explained above, the 911-call combined with Flickner's corroborating observations were plainly enough to stop Dobson and investigate him for erratic driving. During the stop, Flickner learned specific and articulable facts giving rise to a reasonable suspicion of impaired driving. Moreover, any use of the window sticker by Flickner as an excuse or pre-text to stop Dobson's vehicle and investigate either erratic or impaired driving does not run afoul

---

[21] The Court rejects plaintiffs' argument that Flickner wrongly ignored exculpatory information, including that constricted pupils can be caused by sunlight, and that Dobson provided a satisfactory explanation for the fact that his vehicle left its designated lane of travel on the I-390, namely that there was a mechanical issue with the steering. "The law...does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of the circumstances supporting a reasonable basis to believe that criminal activity may be afoot." *See United States v. Bailey*, 743 F.3d 322, 333 (2d Cir. 2014).

of the Fourth Amendment.  *See Whren v. United States*, 517 U.S. 806 (1996) ("[T]he constitutional reasonableness of traffic stops [does not] depend on the actual motivations of the individual officers involved."); *United States v. Gomez*, 877 F.3d 76, 97 (2d Cir. 2017) (a police officer acts reasonably within the meaning of the Fourth Amendment if he uses a traffic stop "as a pretext to stop a car in order to obtain evidence of a more serious crime.")

### *Dobson's Arrest was Support by Probable Cause*

Probable cause exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (*quoting Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  The standard for probable cause is an objective one.  *United States v. Lucas*, 817 F. Supp. 2d 151, 159 (WDNY 2010).  Ultimately, "[t]he existence of probable cause must be determined by reference to the totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238, (1983).  Probable cause claims are evaluated on the basis of what the officer on the scene reasonably perceived and what a reasonable person would think was probable.  *See Walczyk v. Rio*, 496 F.3d 139, 156-57 (2d Cir. 2007).

Here, the undisputed facts demonstrate that Deputy Flickner had probable cause to arrest Dobson for driving while impaired by drugs in violation Section 1192(4) of the New York State Vehicle and Traffic Law.  At the time of the arrest, Flickner knew that Dobson had been driving erratically and leaving his designated lane of the travel of the I-390.  He knew Dobson was confused as to the direction he was traveling.  He noticed

that Dobson exhibited signs of impairment including watery and bloodshot eyes as well as constricted pupils. In addition, Dobson failed three out of the four field sobriety tests administered by Deputy Flickner. Specifically, Dobson failed both the walk and turn test and the one leg stand test. He also failed the modified Romberg balance test, which demonstrates a slowed response time. In light of these circumstances, a reasonable officer with Deputy Flickner's training and experience would have probable cause to believe that Dobson was operating a motor vehicle while impaired by drugs. *See Gatling*, 2020 U.S. Dist. LEXIS 18749, at *17-20 (dismissal of plaintiffs' false arrest claim since there was probable cause to arrest plaintiff for driving while impaired by drugs on the basis that arresting officer found plaintiff's eyes were bloodshot and pupils constricted, and plaintiff failed the walk and turn test as well as the one leg stand test); *Bobolakis v. Dipietrantonio*, 253 Fed. Appx. 85 (2d Cir. 2013) (officers had probable cause to arrest motorist based on two phone calls reporting his erratic driving, his slurred speech, inability to recite the full alphabet, and his glassy and watery eyes).

In arguing that probable cause did not exist here, plaintiffs point to many of the specific observations made Flickner and contend that they were insufficient to justify a finding of impairment. However, the fact remains that probable cause is not considered in a vacuum, nor is it judged based on the strength of each observation or fact considered on its own. Instead, it is evaluated based upon the totality of the circumstances presented to the arresting officer. Here, the undisputed facts in the record show that the totality of circumstances presented to Flicker, considered together, amounted to probable cause to believe that Dobson was driving while impaired by drugs. *Soldo v. Village of Monticello*, 14-CV-3881; 2016 U.S. Dist. LEXIS 115730 (SDNY Aug. 29, 2016); ("[T]he Court does

not view each piece of evidence individually; rather it considers the totality of the circumstances."); *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) (noting that probable cause is evaluated on the totality of the circumstances and therefore "the significance of each [] factor may be enhanced or diminished by surrounding circumstances."); *Stansbury v. Wertman*, 721 F.3d 84, 92 (2d Cir. 2013) ("A story is never a single chapter; it is the experience of the entire tale; the same is true of probable cause.")

In addition, the Court rejects plaintiffs' attempts to create a disputed, material issue of fact as to Dobson's performance on the field sobriety tests. In fact, Dobson now argues that he "believes he successfully performed" the walk and turn test and the one leg stand test.[22] However, during his deposition, Dobson admitted that he stumbled and swayed during the one leg stand test, and that he had to keep his arms up to retain his balance. Likewise, the dashcam video shows Dobson stumbling, swaying and struggling with his balance at various times while performing the field sobriety tests. The video shows Dobson having difficulty both walking in a straight line as instructed and standing on one leg. Consistent with Flickner's assessment, the video shows Dobson stepping off the line twice during the instructional phase of the walk and turn test to retain his balance. Also consistent with Flickner's assessment, the video shows Dobson swaying, hopping, and using his arms for balance during the one leg stand test. The video also depicts, consistent with Flickner's report, that Dobson was experiencing body tremors. The Court declines to credit Dobson's belated, self-serving assertions that he correctly performed two of the field sobriety tests over: (1) Dobson's own prior sworn testimony that he had

---

[22]  Plaintiffs admit that Dobson failed the modified Romberg balance test.

difficulty during parts of the test; (2) Flickner's Incident Report, sworn affidavit and deposition testimony all of which reflect that Dobson failed three of the four field sobriety tests; and (3) the dashcam video footage which is consistent with Flickner's account. *See Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment.")

In sum, after considering the undisputed facts in the record in a light most favorable to plaintiffs, the Court finds that Dobson's arrest on September 21, 2016 for driving while impaired by drugs was supported by probable cause. Because probable cause existed, plaintiffs' false arrest, false imprisonment, and malicious prosecution claims fail as a matter of law.[23]

### *Qualified Immunity*

Even if this Court were to find that Dobson's detention and arrest was not supported by probable cause, which it was, plaintiffs' claims should still be dismissed

---

[23] The Court notes that Deputy Merrick would also be entitled to dismissal of the false arrest claim and malicious prosecution claim because he had no personal involvement in Dobson's arrest or prosecution. In fact, Dobson had already been handcuffed and arrested when he encountered Merrick. *See Cruz v. City of N.Y.*, 232 F. Supp. 3d 438 (SDNY 2017) ("To be liable for false arrest, a defendant must have been personally involved in the arrest.") In order to establish a malicious prosecution claim, "the plaintiff must first show that the defendant initiated or continued the criminal proceeding that allegedly violated the plaintiff's constitutional rights." *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 457-58 (SDNY 2009). Here, Sergeant Merrick had no personal involvement in Dobson's prosecution. He did not sign an accusatory instrument, speak to a prosecutor, or appear in court.

based on qualified immunity. A defendant is entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robinson v. Via*, 821 F.2d 913, 921 (2d Cir. 1987). "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *See Martinez v. Simonetti*, 202 F.3d 625, 636 (2d Cir. 2000). "Arguable probable cause…exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed." *Crenshaw v. City of Mount Vernon*, 372 Fed. Appx. 202 (2d Cir. 2010).

The undisputed facts here, viewed in the light most favorable to plaintiffs, demonstrate that arguable probable cause existed to arrest Dobson for impaired driving. *See Costello v. Milano*, 20 F. Supp 3d 406, 417-18 (SDNY 2014) (arguable probable cause to arrest plaintiff for impaired driving based on breath smell, bloodshot and glassy eyes and difficulty following simple directions); *Corcoran v. Higgins*, 08 Civ. 10734, 2010 U.S. Dist. 47284 (SDNY May 13, 2010) (arguable probable cause to arrest where plaintiff failed three field sobriety tests and had difficulty communicating). Likewise, the Court finds that no reasonable jury, looking at the evidence in the light most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for Flickner to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

_Dobson's Window Stickers Also Provided Probable Cause to Arrest_

Lastly, the Court notes that even if Deputy Flickner did not have probable cause to arrest Dobson for driving while impaired by drugs, which he did, defendants would still be entitled to summary judgment as to the false arrest and false imprisonment claims since Flickner had probable cause to arrest Dobson for the rear window sticker in violation of Section 375(1)(b) of the New York Vehicle and Traffic Law. While traffic infractions are minor offenses, probable cause that a traffic infraction has been committed will satisfy Fourth Amendment requirements for a custodial arrest. _Atwater v. City of Lago Vista_, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.") Thus, the existence of probable cause to arrest for the rear window stickers is a complete defense to Dobson's claim that he was falsely arrested for driving while impaired by drugs. _See Marcavage v. City of New York_, 689 F.3d 98, 109-10 (2d Cir. 2012) ("A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge."); _Jaegly v. Couch_, 439 F.3d 149, 154 (2d Cir. 2006) ("A claim for false arrest turns only on whether probable cause existed to arrest a defendant…it is not relevant whether probable cause existed with respect to…any charge actually invoked by the arresting officer at the time of the arrest."). Further, it is of no constitutional significance that a violation of Section 357(1)(b) of the New York Vehicle and Traffic Law may only result in an appearance ticket, since "a false arrest claim under 42 U.S.C. § 1983 turns on a violation of the Fourth Amendment and not New York State law." _Gatling_, 2020 U.S. Dist. LEXIS 18749, *20 (noting that officer had probable cause

to arrest plaintiff both for driving while impaired by drugs and following another vehicle too closely). *See also Leibin v. Town of Avon*, 3:08-CV-266, 2010 U.S. Dist. LEXIS 78791 (D. Conn. Aug. 4, 2010) ("[E]ven if [the officer] did not have probable cause to arrest [plaintiff] for driving under the influence…the Defendants would still be entitled to summary judgment [on the false arrest claim] for [the officer] certainly had probable cause to arrest [plaintiff] for…his failure to drive in a single lane.")

For these reasons, Dobson's violation of Section 375(1)(b) of the New York Vehicle and Traffic law provides another basis to dismiss his false arrest and false imprisonment claims. *See also Kennedy v. City of New York*, 16-CV-5176, 2019 WL 1317382, at *8 (EDNY Mar. 22, 2019) (When an officer observes a traffic infraction, no matter how minor, probable cause to arrest exists and justifies any subsequent confinement.); *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986) (false imprisonment can only be established if there was not probable cause to support the arrest and detention).

## CONCLUSION

For the foregoing reasons, the Court recommends that defendants' motion for summary judgment (Dkt. No. 43) be granted, and that plaintiffs' complaint be dismissed.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Sinatra.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*  See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:      September 23, 2020
            Buffalo, New York

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

31